IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| **QJ TEAM, LLC, FIVE POINTS HOLDINGS, LLC, JULIE MARTIN, MARK ADAMS, ADELAIDA MATTA, JOHNNY NGUYEN, AND JOHNNY & VU HOME INVESTMENTS, LLC,** individually and on behalf of all other persons similarly situated, | § § § § § § § | |
| *Plaintiffs,* | § § | CIVIL NO. 4:23-CV-1013-SDJ |
| V. | § § | CLASS ACTION |
| **TEXAS ASSOCIATION OF REALTORS, INC., AUSTIN BOARD OF REALTORS, SAN ANTONIO BOARD OF REALTORS, INC., METROTEX ASSOCIATION OF REALTORS, INC., HOUSTON ASSOCIATION OF REALTORS, GREATER EL PASO ASSOCIATION OF REALTORS, GREATER FORT WORTH ASSOCIATION OF REALTORS, INC., FORT HOOD AREA ASSOCIATION OF REALTORS, INC., FOUR RIVERS ASSOCIATION OF REALTORS, INC., TEMPLE-BELTON BOARD OF REALTORS, INC., VICTORIA AREA ASSOCIATION OF REALTORS, INC., WILLIAMSON COUNTY ASSOCIATION OF REALTORS, INC., THE ARLINGTON BOARD OF REALTORS, COLLIN COUNTY AREA REALTORS, INC., CORPUS CHRISTI ASSOCIATION OF REALTORS, INC., GREATER MCALLEN ASSOCIATION OF REALTORS, INC., LONGVIEW AREA ASSOCIATION OF REALTORS, AUSTIN/CENTRAL TEXAS REALTY INFORMATION SERVICE, CENTRAL** | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | |

**TEXAS MULTIPLE LISTING SERVICE,** §
**INC., HOUSTON REALTORS** §
**INFORMATION SERVICE, INC.,** §
**NORTH TEXAS REAL ESTATE** §
**INFORMATION SYSTEMS, INC., ABA** §
**MANAGEMENT, L.L.C., PENFED** §
**REALTY, LLC, EBBY HALLIDAY REAL** §
**ESTATE, LLC, THE DAVE PERRY-** §
**MILLER COMPANY, KELLER** §
**WILLIAMS REALTY, INC., HEYL** §
**GROUP HOLDINGS LLC, THE** §
**LOKEN GROUP, INC., HEXAGON** §
**GROUP, LLC, DMTX, LLC, KELLER** §
**WILLIS SAN ANTONIO, INC., SAN** §
**ANTONIO LEGACY GROUP, LLC,** §
**DSJMM, LLC, FATHOM REALTY, LLC,** §
**SIDE, INC., CITIQUEST PROPERTIES,** §
**INC., HOMESERVICES OF AMERICA,** §
**INC., JP PICCININI REAL ESTATE** §
**SERVICES, LLC, TEAM BURNS, LLC,** §
**ABRE CAPITAL LLC, REALTY** §
**AUSTIN, LLC, ATX WIR LLC, THE** §
**MICHAEL GROUP, LLC, SQUARE MB,** §
**LLC, MARK ANTHONY DIMAS,** §
**GREENWOOD KING PROPERTIES II,** §
**INC., TURNER MANGUM LLC,** §
**MORELAND PROPERTIES, INC.,** §
**REAL AGENT LLC, RFT** §
**ENTERPRISES, INC., ATC METRO** §
**PROPERTIES, INC., MJHM, LLC,** §
**HOMELIGHT, INC., RE-SALT** §
**INVESTMENTS, LLC, MARK WAYNE** §
**COLEMAN, AVIGNON, INC., CLEAR** §
**VIEW REALTY, LLC, BEAM &** §
**BRANCH REALTY, PLLC, AND** §
**WILLIAMS TREW REAL ESTATE** §
**SERVICES, LLC,** §
§
  *Defendants.* §
§
§

---

## TABLE OF CONTENTS

I.    **INTRODUCTION TO THE CONSPIRATORIAL SCHEME**......................................... 5

    A.  NAR's Regulatory Dominion. .................................................................... 6

    B.  MLS Control and Competition Suppression.............................................. 6

    C.  Stifling Competitive Markets. ................................................................... 7

    D.  Home Seller Burden.................................................................................. 7

    E.  Competitive Imbalance. ............................................................................ 7

    F.  Anticompetitive Effects. ............................................................................ 8

    G.  Defendants' Alleged Roles. ....................................................................... 9

II.   **JURISDICTION AND VENUE**........................................................................... 9

III.  **PARTIES** ............................................................................................................ 11

    A.  Plaintiffs.................................................................................................. 11

    B.  Defendants. ............................................................................................. 13

        1.  The Association Defendants. ........................................................... 13

        2.  The MLS Defendants. ...................................................................... 17

        3.  The Broker Defendants.................................................................... 19

        4.  Other Co-Conspirators not Named as Defendants. ........................... 32

IV.   **FACTS** ............................................................................................................... 32

    A.  The Real Estate Market in Texas. ............................................................ 33

    B.  The Role of Multiple Listing Services (MLSs) and the Mandatory Offer of Compensation Rule. ............................................................................... 34

    C.  Anticompetitive NAR Rules..................................................................... 35

    D.  The net effect of Defendants' conspiracy is the stabilization of real estate commissions................................................................................................ 38

E.   Redfin's press release when it withdrew from NAR admits to the existence of the conspiracy. ........................................................................................ 40

F.   Defendants' Participation in the Conspiracy. ........................................... 41

1. The Association Defendants' and MLS Defendants' adoption and enforcement of the Mandatory Offer of Compensation Rule. ........................................... 41

2. The Association Defendants and their members also spread misleading information to the public about the reasons and costs of the commissions paid to buyers' agents. ..................................................................................... 46

3. The Association Defendants also help to cultivate an anti-competitive culture among its agents, thus normalizing the current regime and stigmatizing any agents wanting to compete on rates. ......................................................... 48

4. The Broker Defendants' connection with the Association and MLS Defendants. ........................................................................................... 50

5. The Broker Defendants' enforcement of the "standard" commission real estate commission rate and split. .................................................................... 55

G.   Effects of the Conspiracy ........................................................................ 56

H.   Defendants' Market Power in Texas ........................................................ 57

I.   Continuous Accrual. ............................................................................... 58

**V.    CLASS ACTION ALLEGATIONS** ................................................................. 59

**VI.   ANTITRUST INJURY** ............................................................................... 62

**VII.  CAUSES OF ACTION** ............................................................................... 64

A.   Count 1: Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 – Against all Defendants (brought on behalf of Plaintiffs and the Class) ...................... 64

B.   Count 2: Violations of the Texas Deceptive Trade Practices Act – Against Hexagaon Group, LLC, The Michael Group, Moreland Properties, MJHM LLC, ATC Metro Properties, Inc., Coleman, Avignon, Beam ............................... 66

**VIII.  JURY DEMAND** ....................................................................................... 67

**IX.   PRAYER FOR RELIEF** ............................................................................. 67

## PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT

Comes QJ Team, LLC, Five Points Holdings, LLC, Julie Martin, Mark Adams, Adelaida Matta, Johnny Nguyen, and Johnny & Vu Home Investments, LLC, Plaintiffs herein, and bring this action on behalf of themselves and on behalf of the Class consisting of all persons who listed properties on a Multiple Listing Service in Texas ("the MLS") using a listing agent or broker affiliated with one of the Defendants named herein and paid a buyer broker commission from November 13, 2019, until the present ("the Class Period"). In support thereof, Plaintiffs respectfully allege as follows:

## I.   INTRODUCTION TO THE CONSPIRATORIAL SCHEME

1.      In the realm of Texas real estate lies a concealed conspiracy that has adversely impacted countless home buyers and sellers. Plaintiffs, who have listed their homes on Multiple Listing Services (MLS) in Texas, stand as the voice of those who have borne the brunt of the Defendants' unlawful collaboration and anticompetitive practices. This conspiracy centers around the enforcement of an anticompetitive restraint that compels home sellers to provide an inflated fee to the broker representing the buyer of their properties, thus violating federal antitrust regulations. Notably, the United States Department of Justice's Antitrust Division is currently conducting a thorough investigation into the residential real estate brokerage sector, with a specific focus on broker compensation and related practices.

2.      The creator of the conspiracy is the National Association of Realtors ("NAR"), a trade association for real estate brokers with over 1.5 million individual members. NAR conspired with its largest affiliated associations in Texas and some of the

largest real estate brokerages that worked in Texas during the Class Period.

**A. NAR's Regulatory Dominion.**

3.      At the core of this alleged conspiracy lies NAR, an organization with considerable influence in shaping the real estate landscape.

4.      NAR wields its regulatory authority to impose a rule known as the "Mandatory Offer of Compensation Rule." This rule dictates that every property seller, when listing their home on an MLS affiliated with a local NAR association, must make a sweeping, non-negotiable offer of compensation to buyer brokers. The Defendants, acting in concert with NAR, pressurize or incentivize their franchisees, brokers, and agents to become NAR members and adhere to its regulatory regime. Through this concerted effort, they ensure the implementation and enforcement of the Mandatory Offer of Compensation Rule.

**B. MLS Control and Competition Suppression.**

5.      MLSs acting as reservoirs of property listings available for sale in defined geographic regions, play a pivotal role in the real estate ecosystem. Most homes in the United States are traded through MLS platforms, where brokers are often obligated to include all properties. These MLSs are primarily governed by local NAR associations, and access is granted contingent upon broker compliance with NAR's mandatory regulations outlined in the Handbook on Multiple Listing Policy. This handbook explicitly incorporates the Mandatory Offer of Compensation Rule.

6.      The Defendants and NAR, along with their alleged collaborators, wield significant control over local real estate markets due to their influence in MLSs.

**C.  Stifling Competitive Markets.**

7.      In many MLSs, NAR compels broker compliance with rules that curtail competition. Furthermore, each Defendant mandates or encourages their franchisees, brokerages, and individual realtors to join NAR and implement its anticompetitive regulations, including the Mandatory Offer of Compensation Rule, as a prerequisite for enjoying the benefits of Defendants' branding, brokerage support, and other resources.

8.      As prominent brokers in Texas, their involvement in the alleged conspiracy, manifested through the implementation and enforcement of its rules and policies, is indispensable to the conspiracy's prosperity.

9.      These anticompetitive measures favor the Defendants by enabling brokers to impose charges on home sellers beyond competitive thresholds and thwarting competition from innovative or lower-cost alternatives.

**D.  Home Seller Burden.**

10.     The alleged conspiracy compels home sellers to bear a cost that, in a competitive market and in the absence of the Defendants' anticompetitive restraint, would typically be borne by the homebuyer.

11.     Further, this has led to an industry-recognized practice called "steering," where homeowners are pressured into accepting inflated or stabilized rates out of fear that buyer brokers will not show their home to prospective buyers.

**E.  Competitive Imbalance.**

12.     In the absence of NAR's Mandatory Offer of Compensation Rule, the expense of buyer broker commissions would be incurred by the clients (homebuyers).

This would lead to competition among buyer brokers to offer lower commission rates.

13.     Consequently, the Mandatory Offer of Compensation Rule stifles price competition among buyer brokers because the actual party retaining the buyer broker—the homebuyer—doesn't negotiate or pay the commission for their broker.

**F.  Anticompetitive Effects.**

14.     Adding to the anticompetitive implications of the Mandatory Offer of Compensation Rule, NAR's rules also forbid buyer brokers from making home purchase offers that hinge on reducing the buyer broker's commission.

15.     The conspiracy has led to various illogical, harmful, and anticompetitive effects, including: (a) requiring sellers to pay overcharges for services provided by buyer brokers to the buyer; (b) maintaining, fixing, and stabilizing buyer broker compensation at levels that would not exist in a competitive market; and (c) promoting steering and actions that hinder innovation and entry by new, lower-cost real estate brokerage service providers.

16.     In competitive overseas markets, when homebuyers opt to use a broker, they personally cover the cost, which is less than half of what American buyer brokers receive.

17.     As a result, Defendants' conspiracy has inflated and stabilized buyer broker commissions, resulting in higher total commissions paid by home sellers like Plaintiffs and Class members. Plaintiffs and Class members have each incurred, on average, thousands of dollars in overcharges and damages due to Defendants' alleged conspiracy.

**G. Defendants' Alleged Roles.**

18.      Defendants leverage their control over MLSs, their agreements with local franchisees and agents, their employee policies, and their active roles within NAR and local realtor associations to compel local residential real estate brokers to comply with NAR's regulations, including the Mandatory Offer of Compensation Rule.

19.      Defendants also play a part in implementing the conspiracy by reviewing NAR's Rules and consenting to them at annual meetings, and NAR perpetuates the conspiracy by periodically reissuing its Rules, which include the Mandatory Offer of Compensation Rule. Additionally, Defendants are involved in the conspiracy by serving on boards and committees that oversee compliance with NAR Rules.

20.      Plaintiffs, on behalf of themselves and the Class, bring this lawsuit against Defendants for alleged violations of federal antitrust laws, seeking treble damages, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees.

## II. JURISDICTION AND VENUE

21.      This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the Class defined herein contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a State different from Defendants. Subject matter jurisdiction over this action also exists under 15 U.S.C. § 4 and under 28 U.S.C. §§ 1331, 1337.

22.      This Court has personal jurisdiction over Defendants. They have: (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in

this District; (3) had substantial contacts with the United States, including in this District; and (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

23.    Each Defendant has received revenue attributable to business transacted in Texas and in this District from the brokerage operations of their respective subsidiaries, franchisees, affiliates, and/or transaction counterparts that transact business in Texas and in this District.

24.    Venue is proper in this District under 15 U.S.C. § 22 and under 28 U.S.C. §1391(b), (c), and (d). Each Defendant transacted business, was found, had agents and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

25.    The Mandatory Offer of Compensation Rule and other anticompetitive rules promulgated by NAR have been extended and enforced by Defendants and their co-conspirators in interstate commerce, including this District and the State of Texas. These rules govern local NAR associations, local brokers, and local sales agents across the entire nation. Defendants' conduct, as alleged, has led to the inflation of buyer broker commissions in the state of Texas, causing harm to home sellers in numerous parts of the state of Texas, including this District. Through Defendants, other NAR members, and additional co-conspirators, NAR conducts business in interstate commerce including within this District, engaging in activities that substantially impact interstate trade within the United States.

---

### III. PARTIES

**A. Plaintiffs.**

26.     Plaintiff QJ Team, LLC ("QJ") is a limited liability company organized under the laws of the state of Texas. In the prior four years, QJ sold several properties, including:

- On August 9, 2023, QJ sold real property commonly described as 3917 Legend Trail, Granbury, TX 76049. QJ used the Hexagon Group, LLC (dba Keller Williams Central) as its listing broker. The buyer's broker, whom QJ paid a 3% commission to, was Square MB, LLC (dba Magnolia Realty).

- On November 11, 2021, QJ sold real property commonly described as 3216 Fountain Way, Granbury, TX 76049. QJ used Avignon, Inc. (dba Avignon Realty) as its listing broker. The buyer's broker, whom QJ paid a 3% commission to, was RE/MAX Lake Granbury.

27.     Plaintiff Five Points Holdings, LLC ("FPH") is a limited liability company organized under the laws of the state of Texas. On or about July 2, 2020, FPH sold real property commonly described as 7522 Azalea Lane, Dallas, TX 75230. FPH used The Michael Group LLC as its listing broker. The buyer's broker, whom FPH paid a 3% commission to, was Keller Williams Urban Dallas.

28.     Plaintiff Julie Martin ("Martin") is an individual and citizen of the state of New Mexico. On April 28, 2023, Martin sold real property commonly described as 267 Chrisholm Trail, Bastrop, TX 78602. Martin used Moreland Properties, Inc. as her listing

broker. The buyers' broker, whom Martin paid a 3% commission to, was Real Agent, LLC.

29.     Plaintiff Mark Adams ("<u>Adams</u>") is an individual and citizen of Texas. Plaintiff Adelaida Matta ("<u>Matta</u>") is an individual and citizen of Texas. In the prior four (4) years, plaintiffs have sold several properties:

- On June 17, 2020, Adams and Matta sold real property commonly described as 15144 Dory Dr., Corpus Christi, TX 78418. They used ATC Metro Properties Inc. as their listing broker. The buyers' broker, whom Adams and Matta paid a 3% commission to, was South Coastal Realty, LLC d/b/a Keller Williams Coastal Bend.

- On November 10, 2020, Adams and Matta sold real property commonly described as 18753 Kelly Meadows Ln, New Caney, TX 77357. They used DSJMM, LLC d/b/a Keller Williams Realty Professionals as their listing broker. The buyers' broker, whom Adams and Matta paid a 3% commission to, was Texas Diamond Realty.

- On November 22, 2021, Adams and Matta sold real property commonly described as 13946 Jibstay St., Corpus Christi, TX 78418. They used ATC Metro Properties Inc. as their listing broker. The buyers' broker, whom Adams and Matta paid a 3% commission to, was Coastline Properties.

- On April 7, 2022, Adams and Matta sold real property commonly described as 110 Del Monte Dr., Cibolo, TX 78108. They used MJHM, LLC d/b/a Texas Edge Realty and their listing broker. The buyers' broker, whom Adams and Matta paid a 3% commission to, was Premier

Realty Group.

- On June 7, 2023, Adams and Matta sold real property commonly described as 4814 Heathers Cross, Saint Hedwig, TX 78152. They used MJHM, LLC d/b/a Texas Edge Realty as their listing broker. The buyers' broker, whom Adams and Matta paid a 3% commission to, was Vortex Realty LLC.

30.     Plaintiff Johnny Nguyen ("Nguyen") is an individual and citizen of Texas. On September 22, 2022, Nguyen sold real property commonly described as 213 Ivy Lane, Longview, TX 75605. Nguyen used Mark Wayne Coleman (dba Texas Farms and Ranches) as his listing broker. The buyer's broker, whom Nguyen paid a 3% commission to, was Ramsey Realty Group.

31.     Plaintiff Johnny & Vu Home Investments, LLC ("JVHI") is a limited liability company organized under the laws of the state of Texas. On November 18, 2022, JVHI sold real property commonly described as 1206 Lovers Lane, Longview, TX 75604. JVHI used Mark Wayne Coleman (dba Texas Farms and Ranches) as its listing broker. The buyer's broker, whom Johnny paid a 3% commission to, was Blue Sky Group Realty.

**B.  Defendants.**

**1.  The Association Defendants.**

32.     Defendant Texas Association of Realtors, Inc. ("TAR") is a non-profit corporation organized under the laws of the state of Texas. TAR was founded in 1920 and is composed of over 153,000 realtors and has over 160,000 total members.[1] Over 85% of

---

[1] *See* https://www.texasrealestate.com/wp-content/uploads/2023_TR_Fact_Sheet.pdf.

licensed real estate agents in Texas are members of TAR.[2] Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

33.     Defendant Austin Board of Realtors ("ABOR") is a non-profit corporation organized under the laws of the state of Texas. ABOR was established in 1926 and has over 14,000 members.[3] Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

34.     Defendant San Antonio Board of Realtors, Inc. ("SABOR") is a non-profit corporation organized under the laws of the state of Texas and its principal place of business in San Antonio. SABOR is the largest professional trade organization in San Antonio and represents over 13,000 members. It was organized in 1910 and is an Affiliate of NAR and TAR. SABOR likewise operates an MLS for Bexar and surrounding counties for use by its members. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

35.     Defendant MetroTex Association of Realtors, Inc. ("MetroTex") is a non-profit corporation organized under the laws of the state of Texas. MetroTex was established in 1917 and has over 26,000 members.[4] Defendant has already been served

---

[2] *See id.*

[3] *See* www.aceableagent.com/blog/what-is-austin-board-of-realtors.

[4] *See* https://www.mymetrotex.com/are-you-ready-to-be-a-metrotex-leader/.

with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

36.     Defendant Houston Association of Realtors, Inc. ("HAR") is a non-profit corporation organized under the laws of the state of Texas. HAR is the largest individual dues-paying membership trade association in Houston, and the second largest local association/board of realtors in the United States.[5] Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

37.     Defendant Greater El Paso Association of Realtors ("GEPAR") is a non-profit corporation organized under the laws of the state of Texas. GEPAR is the largest professional trade association in El Paso with over 3,000 members. GEPAR operates an MLS for its members. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

38.     Defendant Greater Fort Worth Association of Realtors, Inc. ("GFWAR") is a non-profit corporation organized under the laws of the state of Texas. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

39.     Defendant Fort Hood Area Association of Realtors, Inc. ("FHAAR") is a non-profit corporation organized under the laws of the state of Texas. Defendant has

---

[5] *See* https://cms.har.com/association_facts/.

already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

40.     Defendant Four Rivers Association of Realtors, Inc. ("FRAR") is a non-profit corporation organized under the laws of the state of Texas. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

41.     Defendant Temple-Belton Board of Realtors, Inc. ("TBBR") is a non-profit corporation organized under the laws of the state of Texas. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

42.     Defendant Victoria Area Association of Realtors, Inc. ("VAAR") is a non-profit corporation organized under the laws of the state of Texas. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

43.     Defendant Williamson County Association of Realtors, Inc. ("WCAR") is a non-profit corporation organized under the laws of the state of Texas. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

44.     Defendant The Arlington Board of Realtors ("Arlington BOR") is a non-profit corporation organized under the laws of the state of Texas. Defendant can be served by serving its registered agent Taylor Oldroyd at 3916 Interstate 20 West, Suite 160, Arlington, TX 76017.

45.     Defendant Collin County Area Realtors, Inc. ("<u>Collin County AR</u>") is a non-profit corporation organized under the laws of the state of Texas. Defendant can be served by serving its registered agent Mary Leidy at 6821 Coit Rd, Plano, TX 75024, or wherever she may be found.

46.     Defendant Corpus Christi Association of Realtors, Inc. ("<u>Corpus Christi AR</u>") is a non-profit corporation organized under the laws of the state of Texas. Corpus Christi AR services 1900 members in the coastal bend area of South Texas, and it operates the South Texas MLS, which covers Nueces, Jim Wells, Live Oak, Kleberg, Brooks, Kenedy, and San Patricio counties. Defendant can be served by serving its registered agent David Z. Conoly, PC at 1930 Glenoak Dr., Corpus Christi, TX 78418.

47.     Defendant Greater McAllen Association of Realtors, Inc. ("<u>GMAOR</u>") is a non-profit corporation organized under the laws of the state of Texas. Defendant can be served by serving its registered agent Anita Moon at 1200 Auburn, Ste. 285, McAllen, TX 78504, or wherever she could be found.

48.     Defendant Longview Area Association of Realtors ("<u>LAAOR</u>") is a non-profit corporation organized under the laws of the state of Texas. LAAOR is a REALTOR® association for Longview, Texas and operates a MLS for its members. Defendant may be served by serving its registered agent Bill Maxwell at 1514 Judson Road, Longview, TX 75601, or wherever he may be found.

**2.   The MLS Defendants.**

49.     Defendant Austin/Central Texas Realty Information Service ("<u>ACTRIS</u>") is a non-profit corporation organized under the laws of the state of Texas. ACTRIS is the

MLS serving eighteen (18) central Texas counties including Travis County and is overseen by ABOR. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

50.     Defendant Central Texas Multiple Listing Service, Inc. ("CTXMLS") is a non-profit corporation organized under the laws of the state of Texas. CTXMLS is the MLS that covers several central Texas counties. It has over 7,700 members and is jointly administered by the Fort Hood Area Association of Realtors, the Four Rivers Association of Realtors, the Williamson County Association of Realtors, the Temple-Belton Association of Realtors, and the Victoria Area Association of Realtors. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

51.     Defendant Houston Realtors Information Service, Inc., ("HRIS") is a corporation organized under the laws of the state of Texas. HRIS is the MSL covering Harris County and administered by HAR. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

52.     Defendant North Texas Real Estate Information Systems, Inc. ("NTREIS") is a corporation organized under the laws of the state of Texas. NTREIS is the MLS covering counties in North Texas, including Dallas and Tarrant counties. It has approximately 40,000 subscribers and fourteen (14) shareholder realtor associations. Defendant has already been served with process and therefore service of this complaint

will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

### 3. The Broker Defendants.

53.    Defendant ABA Management, L.L.C. ("ABA") is a limited liability company organized under the laws of the state of Texas. ABA does business as Allie Beth Allman & Associates. ABA is considered one of North Texas' top real estate firms, with over 425 agents.[6] ABA is (either directly or through its individual brokers and agents) a member of MetroTex and TAR. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

54.    Defendant PenFed Realty, LLC ("PenFed") is a limited liability company organized under the laws of the state of Virgina, with its principal place of business in Alexandria, Virgina. It is a wholly owned subsidiary of PendFed Credit Union and it is the largest independently owned brokerage in the Berkshire Hathaway HomesServices network, placing it in the top 1% of all real estate brokerages in the country. It has almost 70 offices, over 2,000 professionals, and provides services in Texas.[7] PenFed (either directly or through its individual brokers and agents) is a member of the various associations comprising the Association Defendants. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

55.    Defendant Ebby Halliday Real Estate, LLC ("Ebby"), is a limited liability

---

[6] See https://www.texasmonthly.com/news-politics/allie-beth-allman-queen-of-highland-park-homes/.
[7] See https://www.penfedrealty.com/real-estate-about-us.

company organized under the laws of the state of Texas. Ebby Halliday Real Estate, LLC is the largest private residential real estate company in Texas by sales volume and has been in operation since 1945.[8] In 2018, HomeServices of America, Inc., an affiliate of Berkshire Hathaway, acquired Ebby. Defendant has thirty (30) offices and approximately 1,600 real estate agents. It is the tenth (10th) largest real estate firm in the United States. Ebby (either directly or through its individual brokers and agents) is a member of TAR and MetroTex. As further alleged herein, Ebby fosters and enforces an anticompetitive culture, a culture which freely admitted by its agents who frequently post social media comments about how a buyer's agent is "free" and otherwise approving the claim that there is a "standard" 6% real estate commission. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

56.     Defendant The Dave Perry-Miller Company ("DPMC") is a corporation organized under the laws of the state of Texas. DPMC is a real-estate brokerage that was founded by Dave Perry-Miller in 1980. Defendant (either directly or through its individual brokers and agents) is a member of TAR and MetroTex. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

57.     Defendant Keller Williams Realty, Inc. ("Keller Williams")[9] is a corporation

---

[8] https://www.housingwire.com/articles/43579-warren-buffetts-berkshire-hathaway-affiliate-buys-ebby-halliday/
[9] Defendant Keller Williams and its franchisees have reached a settlement in the matters styled *Moehrl v. National Association of Realtors*, No. 1:19-cv-01610 (N.D. Ill.) and *Burnett v. National Association of Realtors*,

organized under the laws of the state of Texas. Keller Williams is a prominent real estate franchise and brokerage firm. It was founded in Austin, Texas in 1983.[10] By 2015, Keller Williams became the largest real estate franchise in the world by agent count.[11] Keller Williams Realty is headquartered in Austin, Texas.[12] Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

58.    Defendant Heyl Group Holdings LLC ("Heyl") is a limited liability company organized under the laws of the state of Texas. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

59.    Defendant The Loken Group, Inc. ("Loken") is a corporation organized under the laws of the state of Texas. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

60.    Defendant Hexagon Group, LLC ("Hexagon") is a limited liability company organized under the laws of the state of Texas. Defendant has already been served with process and therefore service of this complaint will be accomplished

---

No. 19-cv-0332 (W.D. Mo.). A motion for preliminary approval of the settlements was granted by the United States District Court for the Western District of Missouri on February 1, 2024. The order granting the preliminary approval temporarily enjoins Plaintiffs from prosecuting its claims against those parties. However, Plaintiffs are filing this amended complaint in compliance with the Court's scheduling order and have kept the Keller Williams defendants part of the complaint only to avoid voluntarily dismissing those claims prior to final approval of the settlement, but do not intend to otherwise prosecute those claims until the settlement is not approved.

[10] https://thrive.kw.com/our-story/
[11] https://thrive.kw.com/our-story/
[12] https://headquarters.kw.com/contact-us/

pursuant to Rule 5 of the Federal Rules of Civil Procedure.

61.     Defendant DMTX, LLC ("DMTX") is a limited liability company organized under the laws of the state of Texas. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

62.     Defendant Keller Willis San Antonio, Inc. ("KWSA") is a corporation organized under the laws of the state of Texas with its principal place of business in San Antonio, Texas. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

63.     Defendant San Antonio Legacy Group, LLC ("Legacy") is a limited liability company organized under the laws of the state of Texas. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

64.     Defendant DSJMM, LLC (d/b/a Keller Williams Realty Professionals) ("DSJMM") is a limited liability company organized under the laws of the state of Texas. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

65.     Defendant Fathom Realty, LLC ("Fathom") is a limited liability company organized under the laws of the state of Texas. Fathom is a subsidiary of Fathom Holdings, Inc., which advertises itself as a national, technology-driven, real estate platform integrating residential brokerage, mortgage, title, insurance, and SaaS offerings

to brokerages and agents by leveraging its proprietary cloud-based software, intelliAgent. Fathom (either directly or through its individual brokers and agents) is a member of TAR as well as several of the associations comprising the Association Defendants. Fathom, like so many of the other Defendants, creates training materials that emphasizes a sales pitch to buyers that their services are free. While the other Broker Defendants undoubtedly have similar training materials, the referenced example was a video posted on YouTube and therefore publicly available.[13] Fathom likewise posts videos acknowledging a typical buyer's commission of 3%.[14] Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

66.     Defendant Side, Inc. ("Side") is a corporation organized under the laws of the state of Delaware with its principal place of business in San Francisco, California. Side began its operations in 2017 and operates throughout the nation. Side (either directly or through its individual brokers and agents) is a member of the various associations comprising the Association Defendants. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

67.     Defendant Citiquest Properties, Inc. ("Citiquest") is a corporation organized under the laws of the state of Texas with its principal place of business in Houston, Texas. Citiquest was formed in 2008 and has closed over 3,000 transactions

---

[13] https://www.youtube.com/watch?v=2sPk3Fd3wVY.
[14] *See e.g.,* https://www.youtube.com/watch?v=wNVXb0EUolk (at 30:19).

worth over $1 billion dollars. In 2019 alone, Citiquest closed more than 400 transactions worth more than $146 million dollars. Citiquest (either directly or through its individual brokers and agents) is a member of TAR and HAR. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

68.     Defendant HomeServices of America, Inc. ("HSA") is a corporation organized under the laws of the state of Delaware with its principal place of business in Edina, Minnesota. HSA is an affiliate of Berkshire Hathaway and the owner of the Berkshire Hathaway HomeServices and Real Living Real Estate franchise networks. HAS (either directly or through its individual brokers and agents) is a member of the various Association Defendants. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

69.     Defendant JP Piccinini Real Estate Services, LLC ("JPP") is a limited liability company organized under the laws of the state of Texas. JPP is a Texas real estate firm that was founded by Giuseppe 'JP' Piccinini in 2011. It is a full-service real estate brand and franchise platform. The company has approximately 4,000 agents operating in 60 offices across 25 states and closes $8 Billion annually in sales volumes.[15] It is headquartered in Plano, Texas.[16] It is considered one of America's fastest growing 100%

---

[15] *See* https://www.jpar.com/about-jpar/.
[16] *See* https://www.jpar.com/about-jpar/

commission brokerages and top 2023 franchises.[17] JPP (either directly or through its individual brokers and agents) is a member of the various associations comprising the Association Defendants. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

70. Defendant Team Burns, LLC d/b/a Monument Realty ("Burns") is a limited liability company organized under the laws of the state of Texas. Burns is a licensed real estate service provider in Frisco, Texas.[18] It has 1,076 active agents. It has closed approximately 4,167 transactions and closed about $2.2 Billing in sales.[19] Defendant (either directly or through its individual brokers and agents) is a member of TAR, MetroTex, and Collin County AR. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

71. Defendant ABRE Capital LLC d/b/a Real Broker, LLC ("ABRE") is a limited liability company organized under the laws of the state of Texas. ABRE has over 12,000 agents and has sold 18.7 billion in home sales in 12 months as of June 30, 2023. ABRE is (either directly or through its individual brokers and agents) a member of the various associations comprising the Association Defendants. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

---

[17] *See* https://www.jpar.com/about-jpar/.
[18] *See* https://licensee.io/real-estate/9006556-team-burns-llc-tx/.
[19] *See* https://www.monumentrealtytx.com/.

72.     Defendant Realty Austin, LLC ("Realty Austin") is a limited liability company organized under the laws of the state of Texas. Realty advertises itself as the number one independent real estate brokerage in Central Texas. It had approximately $5.3 billion in sales in 2022 and $5.1 billion in sales in 2023. Realty Austin has over 630 agents. Defendant (either directly or through its individual brokers and agents) is a member of TAR, SABOR, and ABOR. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

73.     Defendant ATX WIR LLC ("ATX") dba Watters International Realty, LLC is a limited liability company organized under the laws of the state of Texas. ATX was founded in 2010 and sold 600 homes in 2022 alone. ATX (either directly or through its individual brokers and agents) is a member of TAR, ABOR, and Collin County AR. Like the other Defendants, ATX represents to the public that commissions are typically 6%, like it did in an article posted on its website titled "4 Thinks to Consider When Hiring an Agent." Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

74.     Defendant The Michael Group LLC ("Michael Group") is a limited liability company organized under the laws of the state of Texas. Michael Group is a real-estate brokerage firm in Texas. Defendant (either directly or through its individual brokers and agents) is a member of TAR, MetroTex, and Arlington BOR. Defendant has already been served with process and therefore service of this complaint will be accomplished

pursuant to Rule 5 of the Federal Rules of Civil Procedure.

75.     Defendant Square MB, LLC ("Square") dba Magnolia Realty is a limited liability company organized under the laws of the state of Texas. Square was founded by HGTV stars Chip and Hoanna Gaines in 2007. Square operates in Waco, Austin, Dallas, Houston, Temple, Belton and Killeen, Texas, and has over 93 real estate agents. Defendant (either directly or through its individual brokers and agents) is a member of the various associations comprising the Association Defendants. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

76.     Defendant Mark Anthony Dimas ("Dimas") is an individual who is a citizen of Texas. Dimas is a licensed real estate broker in Cypress, Texas with twenty-three (23) years of experience. He is the broker-owner of Mark Dimas Properties and has offices in Cypress, Houston, San Antonio, and the Dallas-Fort Worth metroplex. Dimas is a member of TAR and HAR. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

77.     Defendant Greenwood King Properties II, Inc. ("Greenwood") is a corporation organized under the laws of the state of Texas with its principal place of business in Houston, Texas. Greenwood was founded in 1984 and is one of only a handful of privately-owned firms in Houston with more than 200 agents. Greenwood advertises yearly sales volume of over $1.5 billion. Greenwood (either directly or through its individual brokers and agents) is a member of TAR, HAR, and GFWAR. Defendant has

already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

78.    Defendant Turner Mangum LLC ("<u>Turner</u>") is a limited liability company organized under the laws of the state of Texas. Turner is a real-estate brokerage firm located in Houston, TX. Tuner (either directly or through its individual brokers and agents) is a member of TAR and HAR. Much like its other Broker Defendants, Turner advertises its services are "free" to buyers. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

79.    Defendant Moreland Properties, Inc. ("<u>Moreland</u>") is a corporation organized under the laws of the state of Texas with its principal place of business in Austin, Texas. Moreland was established in 1986 and has grown to have over 100 agents. In 2016 alone, Moreland had gross sales volume approaching $800 million dollars. Moreland (either directly or through its individual brokers and agents) is a member of TAR and ABOR. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

80.    Defendant Real Agent LLC ("<u>RA</u>") is a limited liability company organized under the laws of the state of Texas. RA is a brokerage firm located in Austin. RA (either directly or through its individual brokers and agents) is a member of TAR and ABOR. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

81.     Defendant RFT Enterprises, Inc. ("RFT") is a corporation organized under the laws of the state of Texas. RFT is a real estate brokerage firm doing business under the "Engel & Völkers" brand in the Dallas-Fort Worth Metroplex. RFT (either directly or through its individual brokers and agents) is a member of TAR, MetroTex, and Arlington BOR. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

82.     Defendant ATC Metro Properties, Inc. ("ATC") is a corporation organized under the laws of the state of Texas with a principal place of business in Corpus Christi, TX. ATC was founded in 1991 and has sold over 1,000 properties. It is a member (either directly or through its individual brokers and agents) of TAR and Corpus Christi AR. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

83.     Defendant MJHM LLC (d/b/a Texas Edge Realty) ("MJHM") is a limited liability company organized under the laws of the state of Texas. MJHM is a real estate brokerage firm that operates primarily in Austin and South Texas. MJHM (either directly or through its individual brokers and agents) is a member of TAR, SABOR, ABOR, and Corpus Christi AR. Defendant has already been served with process and therefore service of this complaint will be accomplished pursuant to Rule 5 of the Federal Rules of Civil Procedure.

84.     Defendant HomeLight, Inc. ("HomeLight") is a corporation organized under the laws of the state of Delaware with its principal place of business in Scottsdale,

Arizona. HomeLight is a licensed real estate broker in Texas, but it also offers other real estate services, including a lead generation service whereby it connects real estate brokers and agents with consumer in return for a percentage of their commission upon the closing of a transaction. Because its revenue is derived, at least in part, from the supracompetitive commission fees which are the subject of this lawsuit, Defendant follows and enforces the Mandatory Offer of Compensation Rule and publishes material on its website advocating for the 6% commission to consumers. Defendant may be served by serving its registered agent, Cogency Global, Inc., at 1601 Elm St., Suite 4360, Dallas, TX 75201.

85.     Defendant RE-SALT Investments, LLC ("RE-SALT") is a limited liability company organized under the laws of the state of Texas. Defendant is a real estate brokerage and is (either directly or through its individual brokers and agents) a member of Corpus Christi AR and TAR. Like many of the other Broker Defendants, RE-SALT actively publishes materials on its website telling consumers that the "standard" commission is 6%.[20] Defendant can be served by serving its registered agent Alissa Spears at 106 Barcelona, Rockport, TX 78382, or wherever she can be found.

86.     Defendant Mark Wayne Coleman ("Coleman") is an individual and citizen of the state of Texas. Coleman is a real estate broker operating under the trade name of "Texas Farms and Ranches," among others. Coleman is a member of LAAOR and TAR. Defendant can be served at his normal place of business at 4138 US Highway 259, Longview, TX 75605, or wherever he can be found.

---

[20] *See* https://www.spearsandcorealestate.com/blog/what-to-ask-your-real-estate-agent/.

87.     Defendant Avignon, Inc. ("<u>Avignon</u>") is a corporation organized under the laws of the state of Texas with its principal place of business in Richardson, TX. Defendant can be served by serving its registered agent Van Dinh at 1144 N. Plano Rd., Ste 133, Richardson, TX 75081, or wherever he may be found.

88.     Defendant Clear View Realty, LLC ("<u>Clear View</u>") is a limited liability company formed under the laws of the state of Texas. Clear View is a real-estate brokerage firm in Texas. Two of Clear View's agents are acting directors of GEPAR, and Clear View actively publishes materials to the public advising that the standard commission rate is 6% and that the seller is "gonna have to pay." Defendant (either directly or through its individual brokers and agents) is a member of TAR and GEPAR. Defendant can be served by serving its registered agent Harper Marisela at 12247 Rojas Dr., El Paso, TX 79936, or wherever she may be found.

89.     Defendant Beam & Branch Realty, PLLC ("<u>Beam</u>") is a limited liability company organized under the laws of the state of Texas. Defendant can be served by serving its registered agent RA Services, LLC at 1840 Acton Highway, Granbury, TX 76049.

90.     Defendant Williams Trew Real Estate Services, LLC ("<u>Williams Trew</u>") is a limited liability company organized under the laws of the state of Texas. Williams Trew advertises itself as Fort Worth's leading residential real estate brokerage firm. In addition to taking action in furtherance of the conspiracy alleged herein, Williams Trew also has written agreements with its buyers that require them to pay a 3% commission regardless of what the Seller's broker is offering, which is their (attempted) workaround of the

ethical prohibition of conveying an offer to a seller that is contingent on the Seller agreeing to increase its Mandatory Offer of Compensation. Defendant (either directly or through its individual brokers and agents) is a member of TAR, MetroTex, and GFWAR. Defendant can be served by serving its registered agent Terry Boyd at 3707 Camp Bowie Blvd., Suite 300, Fort Worth, TX 76107, or wherever she made be found.

### 4.   Other Co-Conspirators not Named as Defendants.

91.     Defendants' co-conspirators not named as defendants include two of the four[21] largest real estate brokers in the country: Anywhere Real Estate Inc. (f/k/a Realogy Holdings Corp.) and RE/MAX Holdings, Inc. along with the National Association of Realtors ("NAR").

92.     Franchisees and brokers of Defendants also participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. Specifically, each complied with and implemented the Buyer-Agent Commission Rule in the geographic areas where the NAR MLSs operate. In addition, other brokers in these areas have participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. These other brokers complied with and implemented the Buyer-Agent Commission Rule in Texas.

93.     Defendants are jointly and severally liable for the acts of their co-conspirators, whether named or not named as Defendants herein.

### IV. FACTS

---

[21] Keller Williams is one of the four largest real estate brokers in the country, but it is a named defendant herein.

## A. The Real Estate Market in Texas.

94.     The state of Texas governs the real estate industry through its licensing regulations. In 2022, approximately 86% of home sellers and buyers in the United States utilized the services of real estate brokers.[22] These regulations classify real estate professionals into two primary categories: (1) real estate brokers, often referred to as "brokerage firms," and (2) individual real estate licensees or agents. These brokers license and assume legal responsibility for the actions of individual real estate realtors or agents

95.     According to Texas law, only licensed brokers are authorized to receive compensation for representing home buyers or sellers in real estate transactions. Consequently, all real estate brokerage contracts must be established with brokers, not agents, and payments to individual agents or realtors are routed through brokers. Many brokers, along with their respective agents, often operate in dual roles, acting as seller brokers for some property sales and as buyer brokers for others.

96.     In standard residential real estate transactions, brokers and agents receive compensation in the form of commissions, calculated as a percentage of the property's sale price, with the payment being realized upon the sale's completion.

97.     Compensation for seller brokers is stipulated in a listing agreement, a contract signed between the seller and the seller broker. This agreement outlines the listing terms and often grants the seller broker exclusive marketing rights to the property. The listing agreement also specifies the total commission to be paid by the seller.

---

[22] https://www.nar.realtor/research-and-statistics/quick-real-estate-statistics

98.     When a buyer engages a broker's services, they typically enter into a contract with that broker. If a buyer retains a broker, the seller remits the buyer broker's compensation. Historically, NAR's Code of Ethics espoused a conduct standard that falsely suggested to buyers that their agent's services are provided at no cost.

99.     The net effect of these agreements and the Mandatory Offer of Compensation Rule is that buyer brokers, who are tasked with representing the buyers' interests against the sellers, receive their compensation from the overall commission paid by the seller, not from the buyers they represent. This has led to significant confusion regarding the functioning of commissions within the real estate market such that many sellers do not understand how and why they are paying the buyer's agent a 3% commission.

100.    Without the Mandatory Offer of Compensation Rule and in a competitive market context (where sellers have no incentive to compensate a buyer broker who works against their interests), buyers would directly pay their brokers. Sellers, in turn, would exclusively pay a commission to their seller broker. Consequently, the seller's total broker commission would amount to approximately half or less of the customary commission paid to remunerate both their seller broker and the buyer's broker, who is advocating for the buyer's interests.

### B. The Role of Multiple Listing Services (MLSs) and the Mandatory Offer of Compensation Rule.

101.    MLSs serve as central repositories for available properties within specific geographic areas, offering access to real estate brokers and their affiliated realtors or

agents who adhere to MLS regulations. Many MLSs are owned and managed by local realtor associations, which are members of NAR.

102.    NAR regulations mandate that seller brokers must list their clients' properties on an MLS. Notably, the failure to list a client's property on an MLS results in diminished visibility for that property, as it is less likely to be presented to potential buyers by buyer brokers.

103.    The Mandatory Offer of Compensation Rule imposes an obligation on seller brokers, acting on behalf of their clients, to make a comprehensive, non-negotiable offer of compensation to buyer brokers whenever they list a property on an MLS affiliated with a local NAR association. In the event that a buyer, who is represented by a broker, ultimately purchases the property, the buyer broker is entitled to the offered compensation.

### C. Anticompetitive NAR Rules.

104.    NAR introduced the Mandatory Offer of Compensation Rule in 1996, incorporating it into the Handbook on Multiple Listing Policy. This rule has remained in effect since its inception.

105.    Before the adoption of the Mandatory Offer of Compensation Rule in 1996, upon information and belief, NAR played a central role in structuring, implementing, and enforcing a similar and equally flawed market structure. Under this system of sub-agency, brokers representing buyers were legally obligated to act in the interest of sellers, even when primarily working with buyers. As a result, the practice of sellers compensating both their selling broker and the buyer's broker persisted.

106.    The inefficiency and confusion inherent in this sub-agency system ultimately led to its collapse when widely exposed in the media.

107.    Following the collapse of the sub-agency system, NAR and its co-conspirators devised and enforced an anticompetitive scheme aimed at perpetuating supra-competitive commissions, impeding innovation, and hindering lower-priced competition. This was accomplished through the Mandatory Offer of Compensation Rule, officially adopted in November 1996.

108.    NAR's Board of Directors and associated committees periodically evaluate and revise the policies in the Handbook. The Mandatory Offer of Compensation Rule has been retained despite criticism from economists and industry experts, who argue that the rule contributes to anticompetitive market conditions and inflated commission rates.

109.    Defendants have actively participated in this anticompetitive scheme by agreeing to follow, promote, and implement the Mandatory Offer of Compensation Rule. These actions have established an environment that perpetuates high commissions and restricts market competition. Indeed, in the Inman Survey (2014), 56% of agents reported that their brokerages require a minimum total commission level to list homes for sellers and brokerages specify a minimum commission rate that must be offered to buyer agents when the brokerages represents the seller.

110.    Furthermore, NAR has invited Defendants and other co-conspirators to join an agreement, whereby participation in the MLS system is contingent upon compliance with anticompetitive restraints set forth in the Handbook. Regardless of their initial involvement in drafting or adopting the Mandatory Offer of Compensation Rule,

Defendants have since joined the conspiracy and committed to upholding and enforcing the rule.

111.    The Handbook explicitly states the Mandatory Offer of Compensation Rule, requiring participants to make unilateral compensation offers when filing properties with an MLS. The Handbook also stipulates that MLSs should not publish listings that do not include compensation offers or invitations for participants to discuss cooperative relationships.

112.    The Mandatory Offer of Compensation Rule transfers a cost that would ordinarily be paid by the buyer, in a competitive market, to the seller. Home sellers effectively become obligated to hire a buyer broker if they want to list their property on an MLS. The system violates antitrust laws by keeping buying agents compensated despite offering limited services. Indeed, in the age of the internet where a buyer is able to search and locate their next house on their computer or smartphone without the assistance of a real estate agent—and they often do just that—a competitive market should have forced lower buyer broker commissions as a reflection of the decreasing need for their services.

113.    In their efforts to steer clients towards homes offering higher commissions, buyer brokers utilize the offered compensation amounts. This steering practice is confirmed by economic literature and has clear anticompetitive effects, making it difficult for brokers to compete based solely on the services they provide to clients.

114.    Defendants and other co-conspirators also employ technology to facilitate steering based on MLS commission information.

**D. The net effect of Defendants' conspiracy is the stabilization of real estate commissions.**

115.     In April of 2022, the Consumer Federation of America ("CFA") published the results of a survey of real estate commission in thirty-five (35) cities throughout the country. This survey was a follow-up from a study conducted in 2021 wherein the CFA analyzed 11,000 recent transactions in twenty-one (21) cites in the eastern half of the United States. This survey updated the results from the 2021 study to include an analysis of 7,000 recent transactions in fourteen (14) cities west of the Mississippi River region. As it relates to the fourteen (14) western cities, the CFA found:

- In each of the five cities – Albuquerque, Boise, Dallas, Houston, and Oakland—more than 82 percent of commission rates were identical;

- In each of 13 cities, at least 49 precent of the rates were identical; and

- In each of eight cities, more than 88 percent of rates ranged between 2.5 and 3.0 percent.

116.     The above findings were consistent with the results from the 2021 analysis of the transactions occurring in the eastern cities, which were:

- In each of eight cities, more than 80 percent of the rates were identical; and

- In each of 16 cities, more than 88 percent of the rates ranged between 2.5 and 3.0 percent.

117.    The above findings demonstrate broad uniformity of commission rates throughout the United States, including in the Texas market. The author of the study (Stephen Brobeck) found this result interesting because rates are supposedly determined individually by listing agents in consultation with their seller clients. Hence, the author asked: "How could these individual home sale decisions result in rates that are so often identical in individual urban markets?"

118.    The study concluded that the "linchpin of a system with uniform commissions is the requirement of MLSs that all brokers listing properties specify the compensation (usually a commission rate) to be received by buyer agents who help sell those properties." That requirement allows brokers to effectively enforce an industry norm wherein the 6% real estate commission is considered "standard," with the listing agent getting 3% of that fee and the buyer's agent the other 3%. The brokers then police their agents with a variety of methods, including the adoption of policy manuals that require their agents who want to deviate from that norm to obtain prior agency approval, failing and refusing to discuss the negotiability of commission rates beyond the route response that "commissions are negotiable," and buyers' agents steering their clients away from low-commission properties. The author likewise found it noteworthy that of the nearly 18,000 transactions analyzed, only seventy-two (72) carried a buyer's agent commission of *more* than 6% while 7,126 carried a rate of exactly 3%.

119.    As observed in the CFA survey, the Mandatory Offer of Compensation Rule is the nexus of the Defendants' conspiracy. The Rule allows the Broker Defendants to effectively stabilize commission rates through a host of anti-competitive behavior. Even

when a broker wants to compete on commission rates—such is the case with so-called "discount brokers" like Redfin—the effect of the conspiracy is so strong that the broker is forced to either join the conspiracy or face annihilation.

**E. Redfin's press release when it withdrew from NAR admits to the existence of the conspiracy.**

120.    On October 3, 2023, in advance of the jury verdict in *Burnett v. NAR*, Redfin, a major broker who used to have a national board seat with NAR, announced that it was withdrawing form the organization. The letter posted on Redfin's website explaining its decision confirms the conspiracy that Defendants and their co-conspirators have been engaged in for decades at the expense of homeowners. The letter states, in relevant part:

> **Resigning from the NAR Board**
>
> …. In the many marketplaces governed by its policies, NAR still blocks sellers from listing homes that don't pay a commission to the buyer's agent, and it blocks websites like Redfin.com from showing for-sale-by-owner listings alongside agent-listed homes. Removing these blocks would be easy, and it would make our industry more consumer-friendly and competitive.
>
> ….
>
> **In Many Markets, We Can't Even Do That**
>
> But often we don't even have that choice. In about half the U.S., including in cities like Charlotte, Dallas, Houston, Las Vegas, Long Island, Minneapolis, Nashville, Phoenix and Salt Lake City, we can't quit NAR individually or en masse, because NAR membership is required for agents to access listing databases, lockboxes, and industry-standard contracts. It's impossible to be an agent if you can't see which homes are for sale, or unlock the door to those homes, or even write an offer.

**We Want NAR to Decouple MLS Access from NAR Support**

We're asking NAR to decouple local access to these tools, including the listing databases known as Multiple Listing Services, from support for the national lobbying organization. Agents shouldn't have to underwrite policies and legal efforts that hurt consumers when most of us got into real estate to help consumers. Redfin's mission after all is to redefine real estate in consumers' favor.

**We're Committed to Our Industry's Future. NAR Isn't the Future.**

Our disagreement is with NAR, not with our industry. Brokerages can compete on price and still cooperate to show all the homes for sale.[23]

## F.   Defendants' Participation in the Conspiracy.

121.     Defendants, in collaboration with NAR, have actively supported, implemented, and enforced the Mandatory Offer of Compensation Rule. Indeed, the Broker Defendants have required their franchisees, brokers, agents, and employees to comply with NAR rules, including the Mandatory Offer of Compensation Rule.

### 1.   The Association Defendants' and MLS Defendants' adoption and enforcement of the Mandatory Offer of Compensation Rule.

122.     While most real estate brokers and their sponsored agents gain access to an MLS through their local association, TAR also maintains an MLS for members who otherwise "don't have access to a multiple listing service."[24] For all times relevant to this Lawsuit, TAR has required members to (a) list all properties they are advertising for sale on its MLS, and (b) include in that listing a unilateral offer of compensation to buyers'

---

[23] *See* https://www.redfin.com/news/redfin-is-leaving-nar/.
[24] *See* https://www.texasrealestate.com/members/member-benefits/tar-mls/.

brokers:

### Section 1.3. Listings Required to filed with the MLS.

A Participant must file all listings taken by or on behalf of the Participant except for the listings described in this subsection….

### Section 5. Cooperative Compensation Specified on Each Listing.

The Participant shall specify, on each listing filed with the MLS, the compensation offered to other MLS Participants for their services in the sale of such listing. Such offers are unconditional….

In filing a property with the MLS, the Participant is making blanket unilateral offers of cooperation to the other MLS Participants, and shall therefore specify on each listing filed with the MLS, the compensation being offered to the other MLS Participants.[25]

123.    The above rules uniformly exist in the rules applicable to all other MLSs operating in Texas, whether those services are operated by a local REALTOR® association, such is the case with SABOR, or if the service is held by a separate entity controlled by a local REALTOR® association, such is the case with HAR and HRIS.

124.    Further, while those same rules likewise provide that "[n]othing in these MLS Rules and Regulations precludes a listing Participant and a cooperating Participant, as a matter of mutual agreement, from modifying the cooperative compensation to be paid in the event of a successful transaction," TAR's own publication essentially recognize the inability for any real negotiation regarding thy buyer's agent's commission.

---

[25] *See* Rules & Regulations Texas REALTORS® Multiple Listing Service effective February 14, 2022.

In the May 2022 edition of its magazine "Texas Realtor," TAR reprinted an article originally published by NAR in November of 2019 on the topic of negotiating a unilateral offer of compensation. The article was presented as a "Frequently Asked Question" and therefore was in a question-and-answer format. The question was this:

> There is a home in the MLS that I think my buyer client would love, but the commission being offered by the listing broker is lower than I want to be paid. It's so low that it won't cover the time or effort I put in to representing the buyer throughout the transaction. I want to do the right thing. What can I do?[26]

125.    The answer to the above question was lengthy and included several strategies a buyer's agent could use to get a higher commission. However, the one thing that an agent could not do was "submit an offer to purchase that is contingent upon an increase in the commission paid" to the agent. [27] The reason why that is forbidden was because such an offer would be "inconsistent with [the agent's] fiduciary duty." In other words, it would create a conflict between the agent and his or her principal, the buyer. Despite the assurances from NAR and TAR that the buyer's agent's commission is negotiable, any upward departure from the unilateral offer of compensation would be by definition gratuitous as it would have to be expressly decoupled from an offer to buy the property.

126.    In addition to the express adoption and enforcement of the Mandatory Offer of Compensation Rule, TAR promulgates a form listing agreement for its members

---

[26] *See* https://www.nar.realtor/about-nar/governing-documents/code-of-ethics/code-comprehension-article-16-commissions-are-negotiable.
[27] *See id.*

(which include all REALTORS® in Texas) to use. The form has an entire section wherein the seller must agree on the amount of compensation to be paid to the buyer's agent:

> **8. COOPERATION WITH OTHER BROKERS:** Broker will allow other brokers to show the Property to prospective buyers. Broker will offer to pay the other broker a fee as described below if the other broker procures a buyer that purchases the Property.
>
> A. <u>MLS Participants</u>: If the other broker is a participant in the MLS in which this Listing is filed, Broker will offer to pay the other broker:
>    (1) if the other broker represents the buyer: _____% of the sales price or $_____; and
>    (2) if the other broker is a subagent: _____% of the sales price or $_____.
> B. <u>Non-MLS Brokers</u>: If the other broker is not a participant in the MLS in which this Listing is filed, Broker will offer to pay the other broker:
>    (1) if the other broker represents the buyer: _____% of the sales price or $_____; and
>    (2) if the other broker is a subagent: _____% of the sales price or $_____.

127.   Recently, the Association Defendants and its allies have emphasized that the seller does not have to agree to pay the buyer's agent anything. For example, CTXMLS recently notified its members that it had updated its system to allow a seller to make a unilateral offer of $0:

*[Image on Next Page]*



**Update to Listing Entry Cooperative Compensation Fields**

Effective **November 20,** Central Texas MLS is updating their listing input system, allowing users to enter any amount in a listing cooperative compensation field.  The "Buyer Agency Compensation" field will now allow $0 or more. Prior to this update, allowed offers of compensation were $.01 or more.

128.    Not to be outdone, after the jury verdict in *Burnett v. NAR* in October of 2023, SABOR quickly passed amendments to its bylaws to likewise make it clear that a seller can make a unilateral offer of $0 when listing their property for sale on its MLS. Before those amendments, the bylaws clearly did not contemplate a unilateral offer of $0. All MLS Defendants had rules in place requiring a unilateral offer of some amount expressed as either a percentage of the sales price or as a fixed amount.[28]

129.    Of course, the effect of a $0 offer is that the buyer's agents will steer their clients away from the property. That aside, the fact that a seller ultimately must agree to the amount of compensation to be offered to the buyer's agent entirely belies Defendants' public statements that a unilateral offer of compensation is really a transaction between

---

[28] *See e.g.,* https://www.screencast.com/t/Fq4gU20LQWt (at 17:27). The foregoing video is published by the GFWAR. The relevant portion of the video displays a slide that says that the listing agent "[m]ay enter commission for Buyer's Agent, Sub-Agent, or both, however, both cannot be zero."

the seller's agent and the buyer's agent. That is simply not the case—these are not truly "cooperative" transactions. The seller's agent is not "sharing" their commission with the buyer's agent. Hence, the seller's agent is not conducting some side negotiation with the buyer's agent about how much of their fee they will part with. The commission split is decided by the seller in the listing agreement.

130.    Because of the rules and practices created and enforced by the Defendants, sellers in Texas (and throughout the nation) are *forced* to pay for the commissions of both their agents and the agents for the buyers. The perverse incentives that flow from that structure have resulted in the supracompetitive commission fees evident in the market—which was always Defendants' goal.

**2. The Association Defendants and their members also spread misleading information to the public about the reasons and costs of the commissions paid to buyers' agents.**

131.    The Broker Defendants, through their Association Defendant proxies, also actively publish materials telling consumers that the services of buyer's agents are "free" or "cost nothing" to create a norm that reinforces their current commission stabilizing scheme. For example, HAR published an article that remains on its website to this day, which says, in pertinent part:

> **How much do REALTORS® cost for all of this?**
>
> You don't need to worry about the expense of hiring a REALTOR®. Why? Because the seller pays the commission for both the seller's and buyer's REALTORS®. It is written in the listing agreement between the seller and their own REALTOR®.
>
> In most cases, the commission is the equivalent of about 6%

of the home's sales price, which is split evenly between both REALTORS® (on a $200,000 home, that would be $6,000 apiece).

Cost to you as a buyer: $0.00.[29]

132.     Another example:

**Why is it FREE to use a buyer's agent?**

Following are 10 great reasons to use a buyer's agent when buying real estate:

#1. Having a buyer's agent is FREE to the buyer. Some people think they can save money by not using a buyer's agent. In most cases, this is simply not true; and in fact, it is usually just the opposite. In residential real estate, the commission is usually paid by the seller whether or not a buyer's agent is involved. Where else can you employ the services and receive the benefits of a trained and experience[d] professional on your side for free![30]

133.     Of course, Defendants make these statements to the public (or allow them to be made) while at the same time adopting rules against such statements. Specifically, in 2021 NAR amended its Handbook on Multiple Listing Policy to include the following prohibition:

**Section 4.5, Services Advertised as "Free"**

MLS participants and subscribers must not represent that their brokerage services to a client or customer are free or available at no cost to their clients, unless the participant or subscriber will receive no financial compensation from any source for those services.

134.     Like all other mandatory rules promulgated by NAR, the above has been

---

[29] *See* "REALTORS® For Buyer's: Are they Free and What are They?" accessed on HAR.Com on February 19, 2024.

[30] *See* "Why is it FREE to use a buyer's agent?" accessed on HAR.com on February 19, 2024.

adopted by the Association Defendants and the MLS Defendants. Further, Defendants often publish materials to the public claiming that the 6% commission is needed to support the services of the brokers and agents. Yet the 6% rate itself is not the product of the market, but is rather the "typical," "standard," and "traditional" fee that is enforced by arcane rules of affiliated trade associations that are unknown to consumers. Consumers do not agree to the 6% commission because that is the best deal that they can get—they agree to it because it is the only deal they can get.

**3. The Association Defendants also help to cultivate an anti-competitive culture among its agents, thus normalizing the current regime and stigmatizing any agents wanting to compete on rates.**

135.    Besides spreading misinformation to the public, the Association Defendants also publish articles directed at its members training them to resist any competition on rates.

136.    For example, in one article published in the June 2022 edition of *Texas Realtor* an article titled "Will you Lower Your Commission?" In that article, TAR advises on strategies on how to rebuff a client's request to lower a commission, including by using resources available at a website called "competition.realtor" that was created by NAR seemingly to advocate against lower commissions. The article ends by warning agents:

> Remember: Commission negotiations should only occur with your broker's knowledge. If a commission negotiation comes up between a sales agent and client, the agent should tell the client that all negotiations are subject to the broker's approval.

137.    Another example is TAR published an article titled "Guide to Broker Commissions in Real Estate Transactions." The article is structured as an answer to

commonly asked questions. One such question was "is there a standard commission for real estate brokers?" The answer was, in relevant part:

> No. The amount of commission you agree to pay your broker is negotiable. There are no rules or policies that set the amount brokers charge.

That article was further distributed by Arlington BOR on its social media accounts. On information and belief, the other Association Defendants likewise endorsed and distributed that article.

138.    Yet in 2019, before Defendants started publishing self-serving statements about how there was no standard real estate commission in the wake of antitrust litigation, Ed Eakin, a broker and regional VP for TAR at the time, published a response to a survey finding that 45% of homeowners did not know that they were paying a buyer's agent's commission when a home sells. Eakin stated: "Hard to believe sellers don't understand they are paying buyer's agents commission as well as listing agent commissions. Our sellers always seem to know that the standard rate of commission is 6% with both listing and buyers agent equally dividing commissions equally." Eakin is not some rogue broker with an outlier opinion. He is a participant in a real estate culture created, enforced, and carefully cultivated by him and his fellow brokers, including the Broker Defendants herein, that holds that there is a standard commission rate of 6% and that commission is shared equally by the seller's and buyer's agents. That culture of collusion motivated the adoption of the Mandatory Offer of Compensation Rule—and now motivates the defense of that rule.

### 4. The Broker Defendants' connection with the Association and MLS Defendants.

139.   The Broker Defendants have all participated in the adoption, implementation, and enforcement of the Mandatory Offer of Compensation Rule. The specific actions taken by the Broker Defendants will be uncovered in greater detail during the discovery phase of this lawsuit. However, publicly available data already shows an overwhelming overlap between the Broker Defendants and the leadership of the Association Defendants. That is not surprising as the Association Defendants are associations comprised of brokers, and, in turn, the MLSs are controlled by the Association Defendants. Hence, all roads lead back to the brokers themselves. In any event, the publicly available data applicable to the relevant time is a veritable "who's who" of the leadership of the Broker Defendants. For example:

- Kent Redding is the current president of ABOR, previously served on its MLS Compliance Committee, and has served on the committees with TAR. Yet Redding is also an agent with Berkshire Hathaway Homeservices.

- Ashely Jackson was the former president of ABOR and has served on many of its committees over the years. Jackson is a an agent of Realty Austin.

- Lockie Ealy is a local association representative of TAR and also an agent of Realty Austin.

- Lori Goto  serves on TAR committee(s) and is likewise an agent

of Realty Austin.

- Romeo Manzanilla was a prior president of ABOR and a regional VP for TAR during the relevant time. Manzanilla was likewise an agent for Realty Austin during the relevant time.

- Kevin P. Scanlan was a prior president of ABOR and is the MLS Director and Chair for ACTRIS. Scanlan was a prior agent for Realty Austin between 2013 through 2016.

- Cord Shiflet is a past president of ABOR and has previously served on its ACTRIS Advisory committee. Shiftlet is an agent with Moreland.

- Lety Ford is the current secretary of FHAAR and she is an agent with JPAR.

- Renae Pretty is a director with FRAR and is also an agent with JPAR.

- Angela Feathers is a director with GEPAR and an agent with JPAR.

- Howard Ashkinos is a director with GFWAR, a local area representative with TAR, and a VP with JPAR.

- Patti Ehrhardt is a director with GFWAR and an agent with JPAR.

- Shannon Ashkinos is a Vice President with GFWAR and a VP with JPAR.

- Kim Gartner is a director with GFWAR and an agent with JPAR.

- Cathy Trevino is the immediate past chair for HAR, a regional VP with TAR, a manager for HomeServices from 2013 until January 2024, and now the managing broker for Side.

- Jeremy Fain is a director-at-large for HAR and an agent for Greenwood.

- Lorraine Abercrombie is the Secretary and Treasurer for HRIS and a director and VP for Greenwood.

- Dovie Morgan was a HAR director in 2017 and a VP of Greenwood.

- Mark Dimas was a director-at-large in 2018 and is a Broker Defendant herein.

- Michael Huff was an HRIS director in 2018 and is an agent for HomeServices.

- Nicole Lopez was part of HAR's leadership in 2018 and 2022, part of TAR's board of directors, and Dimas' COO from 2022-2023.

- Tim Surratt was a director-at-large for HAR between 2019-2022 and a realtor with Greenwood from 1991 through the present.

- Johny Mowad is the 2024 president elect for MetroTex, President of NTREIS, and is an agent with Ebby.

- Belinda Epps is the immediate past president for MetroTex and is an agent with Ebby.

- Betty Arguello is a director with MetroTex and an agent with

Fathom.

- Scott Carnes is a director with MetroTex and an agent with DPMC.

- Ginger Gill is a director with MetroTex and is a broker with Ebby.

- Jeff Robertson was a director for MetroTexas at the same time that he was an agent for Fathom.

- Anna Ramos is a director with SABOR and is an agent for JPAR.

- Mindi Strange is a director with SABOR and is an agent for JPAR.

- Jesse Bugarin was a director for SABOR in 2022-2023 and is an agent for ABRE.

- David Long is a regional VP for TAR and an agent with Ebby.

- Theresa Hill is a regional VP for TAR and a VP for Greenwood.

- Marvin Jolly was a Chairman of the Issues Mobilization Committee for TAR in 2021 and is the regional Senior VP for PenFed.

- Kayla Click is a local area representative for TAR and an agent for Ebby.

- Mike Sweigart is a local area representative for TAR and an agent for Fathom.

- William Anderson is a local area representative for TAR and an agent for Ebby.

- Dana Skiles is a local area representative for TAR and an agent for JPAR.

- Richard Gregory is a local area representative for TAR and an agent for Fathom.

- Sean Hooper is a local area representative for TAR and an agent for Ebby.

- Alex Tyler is a local area representative for TAR and an agent for PenFed.

- Nick Schwedock is a local area representative for TAR and an agent for Square.

- Kristi Sanguinet was a director of WCAR in 2020-2022 and an agent for Square.

- Julie Floyd was a director for WCAR in 2020 and the broker in charge of Realty Austin from 2021-2023.

- Tamar Nelson was a director for WCAR in 2021 and an agent for Realty Austin.

- Nick Kline is the president of Collin County AR, a regional VP for TAR, and is also a VP for PenFed.

140.   The above is taken from information that is publicly available. On information and belief, the individuals comprising of the Broker Defendants likewise participated in the management and decision making of the Association and MLS Defendants during the relevant time, including their anti-competitive conduct.

141.    Accordingly, Defendants and their franchisees, along with their agents, have furthered the conspiracy by agreeing to implement, follow, and enforce NAR's rules, including the Mandatory Offer of Compensation Rule.

### 5. The Broker Defendants' enforcement of the "standard" commission real estate commission rate and split.

142.    The Broker Defendants are among the largest real estate brokers in Texas. Their agents represent both buyers and sellers. Hence, they directly benefit from the inflating and stabilizing of both seller's and buyer's commission fees.

143.    As already alleged herein, the Broker Defendants have participated in the adoption, implementation, and enforcement of the Mandatory Offer of Compensation Rule. With that rule in place, the Broker Defendants then effectively performed a host of anticompetitive conduct designed to inflate and stabilize commission rates at or near 6% (with 3% going to the listing broker and 3% going to the seller's broker). That conduct includes, but is not limited to, the adoption of policy manuals or other informal policies that (a) require their agents who want to deviate from the normal commission rates and structure to obtain prior agency approval (approval that the agents know will not be forthcoming), (b) advising against discussing the negotiability of commission rates beyond the route response that "commissions are negotiable," (c) encouraging, approving, and/or acquiescing to "steering" conduct on the part of their franchisees and agents, wherein the buyer's agent steer their buyer clients away from properties which offer less than a 3% buyer's broker's commission, and (d) publication of materials to the

general public aimed to normalize the current regime.[31]

### G. Effects of the Conspiracy

144.   The conspiracy led by Defendants and NAR have had several anticompetitive effects in Texas, including:

- Inflated Costs and Compelled High Commissions for Home Sellers: The Defendants' conspiracy in Texas has resulted in inflated costs for home sellers. They are compelled to pay commissions to buyer brokers who, paradoxically, represent their adversaries in property negotiations. This practice also compels home sellers to set high buyer broker commissions, which in turn diminishes their control over expenses and market competitiveness.

- Payment of Inflated Commissions and Price Competition Restraint: The conspiracy perpetuates the payment of inflated buyer broker commissions and total commissions by home sellers, reducing the financial benefit sellers derive from property transactions. This anticompetitive conduct significantly restrains price competition among brokers in Texas. Both buyers seeking to retain broker services and sellers seeking to list their properties find their choices constrained by this manipulative environment.

- Separation of Buyer Broker Retention and Commission Setting: The conspiracy has effectively separated the retention of buyer brokers from the setting of broker commissions. In this distorted system, the home buyer now directly retains the services of a buyer broker, while the seller's agent determines the compensation for the buyer broker, exacerbating inefficiencies within the market.

145.   There are no pro-competitive effects stemming from the conspiracy, which is unequivocally anticompetitive and detrimental to the competitive landscape. And any alleged pro-competitive benefits within the MLS system do not justify the Mandatory Offer of Compensation Rule, as they are substantially outweighed by its anticompetitive effects.

---

[31] On this last point, PenFed even tells sellers on its website that "[a] real estate agent's commission isn't always up to them" as if to provide a convenient excuse for the agent when they explain that they cannot negotiate the commission rates. *See* https://www.bhhspenfedrealtytx.com/blog/blog-detail/2021/12/hiring-your-listing-agent.html.

---

146.    Comprehensive economic evidence supports the notion that the conspiracy has resulted in inflated total commissions and buyer broker commissions paid by home sellers, far exceeding what a competitive market would dictate.

147.    In comparison to other countries with competitive real estate markets, commission rates in the United States are significantly higher, including in Texas where in 2022 the average commission was 5.59%. In fact, only 0.5% or less of sellers offer a buyer's agent commission below 2% in Austin, Houston, Dallas, and San Antonio. This high commission rate prevails in the face of the realities of modern home buying where 51% of buyers find by themselves the homes they ultimately purchase on the internet, a fact that should have radically driven down the cost of a buyer's agent's fee. Nonetheless, a large majority (73%) of agents say they will not negotiate their commissions, a stance that would be untenable in a competitive market.

148.    Other economists have reached similar conclusions, highlighting the Mandatory Offer of Compensation Rule's role in restraining price competition and encouraging steering.

## H. Defendants' Market Power in Texas

149.    To the extent Plaintiffs are required to allege a relevant market, the relevant market for the claims herein is no broader than the bundle of services provided to home buyers and sellers by residential real estate brokers with access to MLSs. Defendants' control of MLSs allows them to impose anticompetitive NAR rules on Class members and other market participants.

150.    To the extent Plaintiffs are required to allege a relevant geographic market,

the relevant geographic market for the claims is no larger than the state of Texas. The vast majority of homes sold in Texas were listed on MLSs by brokers subject to MLS and NAR regulations.

151.    Defendants and their co-conspirators collectively possess significant market power within each relevant market. Their influence is achieved through their participation and control over the local MLS and their share of the local market.

152.    Non-conspiring brokers who aim to compete outside the conspiracy face significant barriers to entry:

- Access to MLS is essential for brokers to effectively serve buyers and sellers in the market.
- An alternative listing service aiming to compete with an MLS would require listings that are as comprehensive as an MLS, but brokers within the conspiracy lack the incentive to participate in such a service.
- Home buyers and sellers would be reluctant to utilize a new alternative listing service without a proven track record.
- NAR advises MLSs to enter into non-compete agreements with third-party websites.

**I. Continuous Accrual.**

153.    Over the course of the last four years leading up to the filing of this Complaint, Defendants, in collaboration with brokers operating within MLS-covered regions, systematically applied and received buyer broker commissions and total commissions at inflated rates, all due to their ongoing conspiracy. During this timeframe, Plaintiffs and other members of the Class were obliged to remit these inflated commissions in conjunction with the sale of residential real estate listed on MLSs. Each such payment over the past four years resulted in harm to Plaintiffs and their fellow Class members, giving rise to new causes of action stemming from these injuries.

154.    Throughout the preceding four years, Defendants, alongside their co-conspirators, have consistently upheld, executed, and enforced the Mandatory Offer of Compensation Rule and various other anticompetitive NAR directives in the relevant markets alleged herein.

## V. <u>CLASS ACTION ALLEGATIONS</u>

155.    Plaintiffs bring this action on behalf of themselves, and as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), on behalf of the members of the Classes defined as:

> All persons in Texas who, from November 13, 2019, through the present, used any Defendant or their affiliates (with the exception of Keller Williams Realty, Inc.) as the listing broker in the sale of a home listed on an MLS, and who paid a commission to the buyer's broker in connection with the sale of the home.

156.    For Defendant Keller Williams Realty, Inc. and HomeServices of America, Inc., those Defendants were already included in a class certified in the matter styled *Christopher Moehrl*, et al. v. The National Association of Realtors, et al., Case No. 19-cv-01610, pending in the United States District Court for the Northern District of Illinois, Eastern Division. However, that prior class did not include sales during the entirety of the proposed class period. Hence, a subclass for Keller Williams an HomeServices of America, Inc. should be certified as follows:

> All persons in Texas who, from January 1, 2021, through March 29, 2023, used a listing broker affiliated with Keller Williams Realty, Inc. or HomeServices of America, Inc. in the sale of a home listed on an MLS, and who paid a commission to the buyer's broker in connection with the sale of the home.

157.    Excluded from the Class are Defendants, their officers, directors and employees; any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class are any judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of their law firms.

158.    The Class is readily ascertainable because records of the relevant transactions exist.

159.    Class members are so numerous that individual joinder of all its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiffs believe that the Class has many thousands of members, the exact number and their identities being known to Defendants and their co-conspirators.

160.    Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class.

161.    Common questions of law and fact exist as to all members of the Class and predominate over any question affecting only individual Class members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

- Whether Defendants engaged in the alleged conspiracy;

- Whether the conduct of Defendants' and their co-conspirators caused injury to the business or property of Plaintiffs and the other members of the Class;

- Whether the effect of Defendants' conspiracy was to inflate both  total commissions and buyer broker commissions;

- Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

- Whether Defendants' conduct is unlawful; and

- The appropriate class-wide measures of damages.

162.    Plaintiffs' claims are typical of the claims of the members of the Class because their claims arise from the same course of conduct by Defendants and the relief sought within the Class is common to each member.

163.    Plaintiffs have retained counsel competent and experienced in the prosecution of antitrust class action litigation to represent themselves and the Class. Together Plaintiffs and their counsel intend to prosecute this action vigorously for the benefit of the Class. The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

164.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the Court and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible for the members of the

Class to seek redress for the violations of law alleged herein.

165.    Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

- The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

- The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

- Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## VI. <u>ANTITRUST INJURY</u>

166.    Defendants' anticompetitive agreements and conduct have had the following effects, among others:

- Sellers of residential property have been forced to pay inflated costs to sell their homes through forced payments of commissions to buyer brokers;

- Home sellers have been faced with the fear of steering, such that they

---

set buyer broker commissions to induce  buyer brokers to show the sellers' homes to prospective buyers;

- Price competition has been restrained among brokers seeking to be retained by home buyers, and by brokers seeking to represent home sellers; and

- Defendants and their franchisees and subsidiaries have inflated their profits by a significant margin by the increased total commissions and increased buyer broker commissions.

167.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their businesses or property, having paid higher total commissions than they would have paid in the absence of Defendants' anticompetitive conspiracy, and as a result have suffered damages.

168.    There are no pro-competitive effects of Defendants' conspiracy that are not substantially outweighed by the conspiracy's anticompetitive effects.

169.    Significant economic evidence supports concluding that Defendants' conspiracy has resulted in Class members paying buyer broker commissions and total commissions that have been inflated to a supra-competitive level.

170.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII.   CAUSES OF ACTION

**A. Count 1: Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 – Against all Defendants (brought on behalf of Plaintiffs and the Class).**

171.    Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

172.    Beginning more than four years before the filing of this Complaint, and continuing into the present, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

173.    The conspiracy alleged herein consists of a continuing agreement among Defendants and Defendants' co-conspirators to require sellers of residential property to make inflated payments to the buyer broker.

174.    In furtherance of the contract, combination, or conspiracy, Defendants and their co- conspirators have committed one or more of the following overt acts:

- Participated in the creation, maintenance, re-publication, and implementation of the Mandatory Offer of Compensation Rule and other anticompetitive NAR rules;

- Participated in the establishment, maintenance, and implementation of rules by local NAR associations and MLSs that implemented the Mandatory Offer of Compensation Rule and other anticompetitive NAR rules; and

- Requiring franchisees of the Broker Defendants and others to

---

Plaintiffs' Consolidated Amended Complaint                                Page 64

implement the Mandatory Offer of Compensation Rule and other anticompetitive NAR rules, which each Broker Defendant does through its franchise agreements, policy manuals, and other contracts with its franchisees, affiliates, subsidiaries, and realtors.

• The Broker Defendants' adoption of policy manuals or other informal policies that (a) require their agents who want to deviate from the "standard" 6% commission with 3% going to the buyer's broker to obtain approval, (b) counsel against discussing the negotiability of commission rates beyond the route response that "commissions are negotiable," and (c) encouraging, approving, and/or acquiescing to "steering" conduct on the part of their franchisees and agents.

175.    Defendants' conspiracy has required sellers to pay buyer brokers, to pay an inflated buyer broker commission and an inflated total commission, and it has restrained price competition among buyer brokers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

176.    Defendants' conspiracy has caused buyer broker commissions and total commissions to be inflated. Plaintiffs and the other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate. Absent Defendants' conspiracy, Plaintiffs and the other Class members would have paid substantially lower commissions because the broker representing the buyer of their homes would have been paid by the buyer.

177.    Defendants' conspiracy is a *per se* violation under the federal antitrust laws, specifically 15 U.S.C. § 1.

178.    In the alternative, Defendants' conspiracy is illegal under the federal antitrust laws and violates 15 U.S.C. § 1 under a rule-of-reason analysis.

179.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, Plaintiffs and the other Class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

### B. Count 2: Violations of the Texas Deceptive Trade Practices Act – Against Hexagaon Group, LLC, The Michael Group, Moreland Properties, MJHM LLC, ATC Metro Properties, Inc., Coleman, Avignon, Beam

180.    Plaintiffs repeat and incorporate by reference each paragraph above and in any other count of this Complaint.

181.    This claim for DTPA violations is asserted against Hexagon, The Michael Group, Moreland, MJHM, ATC, Coleman, Avignon, and Beam (the "DTPA Defendants").

182.    The DTPA Defendants acts and omissions violated the following provisions of the DTPA:

- Tex. Bus. & Com. Code § 17.46(b)(12), which prohibits representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and

- Tex. Bus. & Com. Code § 17.50(a)(3) which makes a defendant

liable for any unconscionable action or course of action.

183.    The DTPA Defendants' acts and omissions giving rise to the above violations cannot be characterized as advice, judgment, or opinion.

184.    The DTPA Defendants' acts and omission giving rise to the above violations did not arise from a transaction involving total consideration by Plaintiffs of more than $500,000.

185.    The DTPA Defendants' violations were knowing.

186.    To the extent that the DTPA Defendants may argue that Plaintiffs claims are barred by the applicable statute of limitations, then Plaintiffs allege that this action was commenced within two years after the Plaintiffs discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice.

187.    Plaintiffs seek recovery of their economic damages, additional damages in an amount up to three times their economic damages, reasonable attorneys' fees, and costs of court.

## VIII.   <u>JURY DEMAND</u>

188.    Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a jury trial of all issues so triable.

## IX. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, request relief and pray for judgment against Defendants as follows:

a.    An Order certifying the Class under the appropriate provisions of Rule 23

of the Federal Rule of Civil Procedure, and appointing Plaintiffs and their counsel to represent the Class;

b.  Declarations that the actions of Defendants, as set forth above, are unlawful;

c.  A permanent injunction under Section 16 of the Clayton Act enjoining Defendants from (1) requiring that sellers pay the buyer broker, (2) continuing to restrict competition among buyer brokers and seller brokers, and (3) engaging in any conduct determined to be unlawful;

d.  Appropriate injunctive and equitable relief;

e.  An award to Plaintiffs and the other members of the Class for damages and/or restitution in an amount to be determined at trial;

f.  An award of pre- and post-judgment interest to Plaintiffs;

g.  An award to Plaintiffs for their costs of suit, including reasonable attorneys' fees and expenses;

h.  An award of such other relief as the Court may deem just and proper.

Respectfully submitted,


*/s/ Julie Pettit*
Julie Pettit
State Bar No. 24065971
jpettit@pettitfirm.com
David B. Urteago
State Bar No. 24079493
durteago@pettitfirm.com
**THE PETTIT LAW FIRM**
2101 Cedar Springs, Suite 1540
Dallas, Texas 75201
Telephone: (214) 329-0151
Facsimile: (214) 329-4076

Michael K. Hurst
State Bar No. 10316310
mhurst@lynnllp.com
Chris Schwegmann
State Bar No. 24051315
cschwegmann@lynnllp.com
Yaman Dasai
State Bar No. 24101695
ydesai@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839

Laurence D. King
**KAPLAN FOX & KILSHEIMER LLP**
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone: (415) 772-4700
Facsimile: (415) 772-4707
lking@kaplanfox.com

Frederic S. Fox
Jeffrey P. Campisi
Matthew P. McCahill
**KAPLAN FOX & KILSHEIMER LLP**
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
ffox@kaplanfox.com
jcampisi@kaplanfox.com
mmccahill@kaplanfox.com

***Attorneys for Plaintiffs and the Proposed
Class***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing

document was served on all counsel of record ***via ECF*** pursuant to the Federal Rules of

Civil Procedure on March 15, 2024:

*/s/ Julie Pettit*
Counsel for Plaintiffs